KISH ET AL. *v.* CITY OF AKRON.

[Cite as *Kish v. Akron,* 109 Ohio St.3d 162, 2006-Ohio-1244.]

(No. 2004–0738—Submitted February 15, 2005—Decided March 20, 2006.)

O'CONNOR, J.

{¶ 1} Pursuant to S.Ct.Prac.R. XVIII(6), we accepted these questions of state law certified by the United States Court of Appeals for the Sixth Circuit: "What constitutes a 'record' as that term is used in Ohio Rev.Code § 149.351?" [1] *Kish v.*

---

1. The Sixth Circuit posed the following certified questions: "1a. What constitutes a 'record' as that term is used in Ohio Rev.Code § 149.351? 1b. What constitutes a 'violation' as that term is used in Ohio Rev.Code § 149.351? 1c. Are the damages provided for under Ohio Rev.Code § 149.351 punitive, liquidated, or compensatory in nature? 2. Does Ohio Rev.Code § 2744.05(A) protect a political subdivision from an award of punitive damages even though the intentional tort (spoliation) that led to the award arguably had its genesis in a dispute over wages and hours? 3. Similarly, does Ohio Rev.Code § 2744.05(C)(1) limit a damage award against a political subdivision to $250,000 even though the intentional tort (spoliation) that led to the award arguably had its genesis in a dispute

*Akron,* 102 Ohio St.3d 1529, 2004-Ohio-3580, 811 N.E.2d 1149, and "What constitutes a 'violation' as that term is used in Ohio Rev.Code § 149.351?" *Kish v. Akron,* 106 Ohio St.3d 1402, 2005-Ohio-3118, 829 N.E.2d 1215.

{¶ 2} We hold that "record," as used in R.C. 149.351 and defined in R.C. 149.011, may be a single document within a larger file of documents as well as a compilation of documents, and can be any document, regardless of physical form or characteristic, whether in draft, compiled, raw, or refined form, that is created or received or used by a public office or official in the organization, functions, policies, decisions, procedures, operations, or other activities of the office. Having reached that conclusion, we further hold that "violation," as that term is used in R.C. 149.351(B), means any attempted or actual removal, mutilation, destruction, or transfer of or damage to a public record that is not permitted by law.

### Facts and Procedural History

{¶ 3} The Sixth Circuit provides the following statement of facts, upon which we rely. Respondents, Elizabeth Kish and Victoria Elder, were employed as administrative personnel by the petitioner, the city of Akron, Ohio, in its Plans and Permits Division ("the division"). George Jumbert managed the division.

{¶ 4} Respondents were members of the Civil Service Personnel Association, Inc. ("the union"). Pursuant to an Akron ordinance and the collective-bargaining agreement between Akron and the union, respondents were entitled to compensation at a rate of time-and-a-half for overtime work. The division also had an informal compensatory-time ("comp-time") policy that was not authorized by Akron or the union. The division's comp-time policy allowed flexible time off on an hour-for-hour basis for overtime work that an employee performed.

{¶ 5} Employees recorded the comp time they accrued and used on forms provided by the division and then submitted the forms to designated division employees, including Elder. Unlike other payroll-related records, which were reported to Akron's Finance Division, Jumbert's division stored and oversaw comp-time records, which included the comp-time sheets and a black book containing the tally of comp time for each employee.

{¶ 6} Kish questioned Jumbert about the comp-time policy and, eventually, brought a grievance about it. After the union president sent a letter to Jumbert

---

over wages and hours? 4. Do nearly identical damage awards for claims of spoliation and destruction of public records, which have their genesis in the same transaction, constitute an impermissible double recovery?" We initially accepted only 1a to answer. *Kish v. Akron,* 102 Ohio St.3d 1529, 2004-Ohio-3580, 811 N.E.2d 1149. After hearing and upon further consideration, however, we ordered the parties to submit supplemental briefs on question 1b, *Kish v. Akron,* 106 Ohio St.3d 1402, 2005-Ohio-3118, 829 N.E.2d 1215, and set the case for additional arguments on that discrete issue. *Kish v. Akron,* 106 Ohio St.3d 1553, 2005-Ohio-5531, 836 N.E.2d 579.

indicating that Kish intended to pursue a complaint with labor authorities over the policy, the petitioner discontinued it, informing division employees that henceforth, they were to work their shifts according to the terms mandated in the collective-bargaining agreement. Akron also informed the union's president that the city would not reimburse employees for unused comp time.

{¶ 7} Meanwhile, Kish transferred to another city department, and Elder resigned. Another Akron employee, Cristen Stevens, assumed Elder's duties, including those related to the management of the division's comp-time records. Stevens destroyed the documents after the termination of the program.

{¶ 8} Respondents sued petitioner and Jumbert in federal court, seeking compensation for their unused comp time. They alleged, and Akron denied, that the comp-time records were destroyed deliberately in an effort to impede their claims.

{¶ 9} A jury found in respondents' favor on the claims for violations of the federal Fair Labor Standard Act ("FLSA") and Ohio's public-records-retention law and for spoliation of evidence. On the FLSA claim for unpaid overtime, the jury awarded Kish and Elder $493.35 and $414.98, respectively. As the Sixth Circuit Court of Appeals described the verdict on the records claim, "The jury found that Kish and Elder had established the destruction of 480 and 380 records respectively in violation of Ohio Rev.Code § 149.351. Because the statute authorizes damages in the amount of one thousand dollars 'for each violation,' Ohio Rev.Code § 149.351(B)(2), the jury assessed damages in the amount of $480,000 to Kish and $380,000 to Elder." The jury also awarded $500 in actual damages to each respondent for spoliation. Citing an impermissible double recovery, the trial court partially granted petitioner's motion for remittitur.

{¶ 10} Both parties appealed, presenting a disagreement over the number of records destroyed. In addressing the dispute, the Sixth Circuit, acting sua sponte, framed the issues presented to us: "What constitutes a 'record' as that term is used in Ohio Rev.Code § 149.351?" and "What constitutes a 'violation' as that term is used in Ohio Rev.Code § 149.351?"

{¶ 11} In answering the first question, Akron urges us to focus on the function of the documents rather than on their form. It contends that not every individual comp-time sheet is a record pursuant to R.C. 149.011(G). Rather, it argues that only the two files of compiled comp-time sheets relevant to Kish and Elder and the tally book are records and, thus, that only three records were destroyed in this case. As Akron poses it, although "each page of that record formed a part of the record, each separate page is not a *separate* public record. The 'record' here is the compensatory time file, as compensatory time could not have been determined from review of a single piece of paper from that file." (Emphasis added.) Petitioner continues, "In this case the compensatory time sheets and

documents located in the compensatory time file for each employee should comprise one compensatory time record, the destruction of which is one violation."

{¶ 12} Respondents counter that each form submitted by respondents constitutes a record. They assert that each time sheet had value to Akron and documented the accrual or use of comp time (and other time off) on any given day. Respondents argue that because "records" includes "*any* document" (emphasis added), R.C. 149.011(G), the certified question is answered by referring to the statutory definition. That definition, they assert, mandates a finding that each comp-time form is a record.

{¶ 13} Similarly, there is debate as to the number of "violations" that occurred here. Akron contends, variously, that there was one violation, or maybe two or three, because there was but one record, or maybe two or three. Akron first seems to link the question of a violation to the number of records destroyed; somewhat inconsistently, it later argues that the question of the number of violations turns on the number of acts or "transactions" of destruction rather than on the number of documents destroyed. Not surprisingly, respondents' view of "violation" focuses narrowly on the number of documents destroyed rather than on the manner in which they were destroyed.

## Analysis

{¶ 14} In answering these questions related to statutory definitions within Ohio's records laws,[2] we first "must look at the purpose and meaning behind keeping records." *White v. Clinton Cty. Bd. of Commrs.* (1996), 76 Ohio St.3d 416, 419, 667 N.E.2d 1223.

{¶ 15} "In a democratic nation * * * it is not difficult to understand the societal interest in keeping governmental records open." *State ex rel. Natl. Broadcasting Co., Inc. v. Cleveland* (1988), 38 Ohio St.3d 79, 81, 526 N.E.2d 786. A fundamental premise of American democratic theory is that government exists to serve the people. In order to ensure that government performs effectively and properly, it is essential that the public be informed and therefore able to scrutinize the government's work and decisions. See, e.g., *Barr v. Matteo* (1959), 360 U.S. 564, 577, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (Black, J., concurring); Moyer, Interpreting Ohio's Sunshine Laws: A Judicial Perspective (2003), 59 N.Y.U.Ann.Surv.Am.L. 247, fn. 1, citing letter to W.T. Barry (Aug. 4, 1822), in 9 The Writings of James Madison (Hunt Ed.1910) 103. As Thomas Jefferson

---

2. The court acknowledges with appreciation the briefs provided by amici curiae, the Ohio Civil Rights Coalition, the Ohio NOW Legal Defense and Education Fund, the Committee Against Sexual Harassment, the Ohio Employment Lawyer's Association, the Ohio Municipal League, the Ohio Newspaper Association, and the Ohio Coalition for Open Government.

wrote, " 'The way to prevent [errors of] the people is to give them full information of their affairs thro' the channel of the public papers, and to contrive that those papers should penetrate the whole mass of the people. The basis of our governments being the opinion of the people, the very first object should be to keep that right * * *.' " Id., quoting letter to Edward Carrington (Jan. 16, 1787), in 11 The Papers of Thomas Jefferson (Boyd Ed.1955) 49.

{¶ 16} Public records are one portal through which the people observe their government, ensuring its accountability, integrity, and equity while minimizing sovereign mischief and malfeasance. See, e.g., *State ex rel. Gannett Satellite Information Network, Inc. v. Petro* (1997), 80 Ohio St.3d 261, 264, 685 N.E.2d 1223; *State ex rel. Strothers v. Wertheim* (1997), 80 Ohio St.3d 155, 157, 684 N.E.2d 1239. Public records afford an array of other utilitarian purposes necessary to a sophisticated democracy: they illuminate and foster understanding of the rationale underlying state decisions, *White*, 76 Ohio St.3d at 420, 667 N.E.2d 1223, promote cherished rights such as freedom of speech and press, *State ex rel. Dayton Newspapers, Inc. v. Phillips* (1976), 46 Ohio St.2d 457, 467, 75 O.O.2d 511, 351 N.E.2d 127, and "foster openness and * * * encourage the free flow of information where it is not prohibited by law." *State ex rel. The Miami Student v. Miami Univ.* (1997), 79 Ohio St.3d 168, 172, 680 N.E.2d 956.

{¶ 17} Not surprisingly then, our founders rejected the English common-law and property theories that curtailed citizens' access to governmental information. See *Natl. Broadcasting Co.*, 38 Ohio St.3d at 81, 526 N.E.2d 786; *Wells v. Lewis* (1901), 12 Ohio Dec. 170; Moyer, 59 N.Y.U. Ann.Surv.Am.L. at 247–248. Instead, our legislators, executives, and judges mandated and monitored the careful creation and preservation of public records, *White*, 76 Ohio St.3d at 419, 667 N.E.2d 1223, and codified the people's right to access those records. Such statutes, including those constituting R.C. Chapter 149, reinforce the understanding that open access to government papers is an integral entitlement of the people, to be preserved with vigilance and vigor. See, e.g., *State ex rel. Warren Newspapers, Inc. v. Hutson* (1994), 70 Ohio St.3d 619, 623, 640 N.E.2d 174; *Wertheim*, 80 Ohio St.3d at 157, 684 N.E.2d 1239; *Dayton Newspapers, Inc. v. Dayton* (1976), 45 Ohio St.2d 107, 109, 74 O.O.2d 209, 341 N.E.2d 576.

{¶ 18} In recognition that the right of access to government records is a hollow one if records are not preserved for review, R.C. 149.351 proscribes the destruction, mutilation, removal, transfer, or disposal of or damage to public records and imposes penalties for violation of the law, including "a forfeiture in the amount of one thousand dollars for each violation." R.C. 149.351(B)(2). "Records" is defined in R.C. 149.011(G) as "any document, device, or item, regardless of physical form or characteristic, * * * created or received by or coming under the jurisdiction of any public office of the state * * * which serves to document the

organization, functions, policies, decisions, procedures, operations, or other activities of .the office." The penalty portion of the Public Records Act builds upon that definition. See R.C. 149.43(A)(1).

{¶ 19} As we interpret the definition of "record," we must be faithful to the language of and legislative intent behind the statute. *State v. S.R.* (1992), 63 Ohio St.3d 590, 594, 589 N.E.2d 1319. In determining this intent, we give effect to the "usual, normal and customary meaning" of a statute's words. *State ex rel. Pennington v. Gundler* (1996), 75 Ohio St.3d 171, 173, 661 N.E.2d 1049. Furthermore, we must be mindful of the vitality of public-documents law as we discussed in *White,* 76 Ohio St.3d at 419, 667 N.E.2d 1223, and construe the statute liberally to effectuate broad access to records. See *State ex rel. Plain Dealer v. Ohio Dept. of Ins.* (1997), 80 Ohio St.3d 513, 518, 687 N.E.2d 661; *State ex rel. Gannett Satellite Information Network, Inc.,* 80 Ohio St.3d at 264, 685 N.E.2d 1223; *Hutson,* 70 Ohio St.3d at 623, 640 N.E.2d 174.

{¶ 20} We previously have held that the General Assembly's use of "includes" in R.C. 149.011(G) as a preface to the definition of "records" is an indication of expansion rather than constriction, restriction, or limitation and that the statute's use of the phrase "any document" is one encompassing all documents that fit within the statute's definition, regardless of "form or characteristic." *State ex rel. Cincinnati Post v. Schweikert* (1988), 38 Ohio St.3d 170, 172–173, 527 N.E.2d 1230. There can be no dispute that there is great breadth in the definition of "records" for the purposes here. Unless otherwise exempted or excepted, almost all documents memorializing the activities of a public office can satisfy the definition of "record." *State ex rel. Beacon Journal Publishing Co. v. Bond,* 98 Ohio St.3d 146, 2002-Ohio-7117, 781 N.E.2d 180, ¶ 13. Indeed, any record that a government actor uses to document the organization, policies, functions, decisions, procedures, operations, or other activities of a public office can be classified reasonably as a record. See *State ex rel. Mothers Against Drunk Drivers v. Gosser* (1985), 20 Ohio St.3d 30, 33, 20 OBR 279, 485 N.E.2d 706. So can any material upon which a public office *could* rely in such determinations. *State ex rel. Mazzaro v. Ferguson* (1990), 49 Ohio St.3d 37, 40, 550 N.E.2d 464. The document need not be in final form to meet the statutory definition of "record." *State ex rel. Cincinnati Enquirer, Div. of Gannett Satellite Information Network, Inc. v. Dupuis,* 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 20. See, also, *State ex rel. Calvary v. Upper Arlington* (2000), 89 Ohio St.3d 229, 232, 729 N.E.2d 1182.

{¶ 21} Despite the breadth of the public-records law, petitioner invites the court to define "record" in a manner that would transmogrify the 860 documents that the jury and the federal district court found to be individual "records" into

168

component parts that are of no moment until subsumed into a single, larger compilation. We decline to do so.

{¶ 22} As the trial court declared, "Clearly each record in and of itself was a unit of measure, as explained by the witnesses." As a "unit of measure," each comp-time sheet had independent meaning and function in documenting the policies, functions, procedures, operations, or other activities of a public office, and in making larger calculations (the tally and black book) about those activities. Therefore, each one is a record. See *Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163; *Ferguson*, 49 Ohio St.3d 37, 550 N.E.2d 464; *Gosser*, 20 Ohio St.3d 30, 20 OBR 279, 485 N.E.2d 706. Petitioner's suggestion to the contrary is asserted without any reference to legislative history that evinces that intent by the General Assembly. Given the purposes and philosophical underpinnings of the public-records and records-retention laws, it is unlikely that the legislature would have intended such a narrow reading of the statute.

{¶ 23} And notwithstanding petitioner's suggestions to the contrary, petitioner's vision of a record is not reflected in Ohio's well-established precedent. For example, the petitioner's reliance on *State ex rel. Beacon Journal Publishing Co. v. Whitmore* (1998), 83 Ohio St.3d 61, 697 N.E.2d 640, is inapposite, for in that case, we concluded that letters sent from members of the public to a trial judge in an effort to influence her sentencing decision were not public records, because the judge did not rely upon the letters. Here, however, there is no question that the documents submitted to the division were relied upon. They were used to calculate the tally and make decisions about the use of comp time. *Whitmore* does not buttress petitioner's position.

{¶ 24} Similarly, petitioner misplaces reliance on *State ex rel. Margolius v. Cleveland* (1992), 62 Ohio St.3d 456, 460, 584 N.E.2d 665, to assert that the individual comp-time forms were not individual records. In *Margolius*, we held that the manner in which records are organized can add to the value of the information contained within the records themselves and that "[w]hen such value is added, a new set of enhanced public records is created that must be disclosed to the public." We further held that a member of the public is entitled to copy portions of computer tapes—not simply the voluminous records containing the information found on the tapes—as a public record. Id. at 459–460, 584 N.E.2d 665. Contrary to the petitioner's suggestion, we did not use the terms "set of public records" and "public record" to indicate that the two were equivalent or to imply that one had been transformed into the other. This court clearly recognized that various types of records stored in various ways are nevertheless records under R.C. 149.011(G). Indeed, in *Margolius*, 62 Ohio St.3d at 459, 584 N.E.2d 665, we cited *Schweikert*, 38 Ohio St.3d at 173–174, 527 N.E.2d 1230, to reiterate the proposition that "*a compilation of information* gathered from public

records *is a separate public record* subject to disclosure under R.C. 149.43." (Emphasis added.) Accord *State ex rel. Scanlon v. Deters* (1989), 45 Ohio St.3d 376, 379, 544 N.E.2d 680 (noting that although there is no obligation to create a new form of a public record, if a clerk's computer is already programmed to produce a desired record or document, the record already exists for purposes of R.C. 149.43 and needs to be produced), overruled on other grounds by *State ex rel. Steckman v. Jackson* (1994), 70 Ohio St.3d 420, 639 N.E.2d 83, paragraph one of the syllabus (in pending criminal cases, a party seeking public records must seek the records through mandamus); Fed.R.Evid. 803(8), identifying public records as "[r]ecords, reports, statements, *or* data *compilations, in any form,* of public offices or agencies." (Emphasis added.) If a compilation is a *separate* public record, a fortiori, the documents underlying the compilation must also be public records. And of course, a single pleading in a case is a public record, *Gosser,* 20 Ohio St.3d at 33, 20 OBR 279, 485 N.E.2d 706, as is a single document within a file, even if not in final form.[3] *Dupuis,* 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 20.

{¶ 25} Time sheets of government employees "fall squarely within the definition of 'records'" for purposes of the Public Records Act, *State ex rel. Beacon Journal Publishing Co. v. Bodiker* (1999), 134 Ohio App.3d 415, 422, 731 N.E.2d 245, accord *State ex rel. Multimedia, Inc. v. Snowden* (1995), 72 Ohio St.3d 141, 143, 647 N.E.2d 1374, even though they were also tallied and used to render a final decision on the amount of time and pay accrued by employees. Had the legislature intended "record" to be limited otherwise, it would have modified the term itself, as it has done in analogous statutes. See *White,* 76 Ohio St.3d at 418, 422–423, 667 N.E.2d 1223 (in addressing the "interpretation of R.C. 305.10 and its interplay with R.C. 121.22 (the Sunshine Law) and 149.43 (Ohio Public Records Act)," holding that "full record" as it is used in R.C. 305.10 "implicitly includes a

---

3. We do not hold that each page of the pleadings in the case, the trial transcript, the exhibits, and depositions constitutes a separate record. We do not know whether the time sheet used by Akron is a single-page or a multipage document because the record is not before us and the appendix does not contain an exemplar. But we do not need one to hold that the time sheets used by Akron to document the accrual and use of a public office's employees' time off, i.e., its time-off procedures, operations, and activities, fall within the general rule that such documents—whether comprising one page or myriad pages—are classified reasonably as public records. Any suggestion to the contrary ignores this court's precedent holding that public records can be items, documents, and items within documents. See, e.g., *State ex rel. Beacon Journal Publishing Co. v. Akron* (1994), 70 Ohio St.3d 605, 606, 640 N.E.2d 164 (Social Security numbers found within payroll files were "records" for purposes of R.C. 149.011(G)); *Dupuis,* 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 21 (settlement proposal within larger court record is a public record). Moreover, a contrary holding would ignore our precedent that the public-records laws should be read broadly and construed liberally to effectuate the intent of the statute. See *State ex rel. Plain Dealer,* 80 Ohio St.3d at 518, 687 N.E.2d 661; *Gannett Satellite Information Network, Inc.,* 80 Ohio St.3d at 264, 685 N.E.2d 1223; *Hutson,* 70 Ohio St.3d at 623, 640 N.E.2d 174.

duty * * * to comply with the more comprehensive requirements of R.C. 121.22").

{¶ 26} In the case presented here, the separate comp-time sheets and the ledger that compiled and contained a summary of the information on the comp-time sheets are all individual records under R.C. 149.011(G). To hold otherwise would be to ignore that the people's right to know includes "not merely the right to know a governmental body's final decision on a matter, but the ways by which those decisions were reached." See *State ex rel. Gannett Satellite Information Network v. Shirey* (1997), 78 Ohio St.3d 400, 404, 678 N.E.2d 557, citing *White*, 76 Ohio St.3d at 419, 667 N.E.2d 1223.

{¶ 27} We advise the federal appeals court that "record," as used in R.C. 149.351 and defined in R.C. 149.011, may be a single document within a larger file of documents as well as a compilation of documents and can be any document, regardless of physical form or characteristic, whether in draft, compiled, raw, or refined form, that is created or received or used by a public office or official in the organization, functions, policies, decisions, procedures, operations, or other activities of the office. In this case, each comp-time form at issue is a record pursuant to Ohio law.

{¶ 28} Because we find that the definitions of "record" and "violation" are analytically distinct but congruent and interrelated, we proceed to address the issues raised by the query regarding "violation" as it appears in R.C. 149.351.

{¶ 29} R.C. 149.351 provides:

{¶ 30} "(A) *All records* are the property of the public office concerned and shall not be removed, destroyed, mutilated, transferred, *or* otherwise damaged or disposed of, *in whole or in part,* except as provided by law * * *.

{¶ 31} "(B) Any person who is aggrieved by the removal, destruction, mutilation, *or* transfer of, *or by other damage* to or disposition of a record in violation of division (A) of this section, *or* by threat of such removal, destruction, mutilation, transfer, *or other damage to or disposition of such a record,* may commence either or both of the following in the court of common pleas of the county in which division (A) of this section allegedly was violated or is threatened to be violated:

{¶ 32} "(1) A civil action for injunctive relief to compel compliance with division (A) of this section, and to obtain an award of the reasonable attorney's fees incurred by the person in the civil action;

{¶ 33} "(2) A civil action to recover a forfeiture in the amount of one thousand dollars *for each violation,* and to obtain an award of the reasonable attorney's fees incurred by the person in the civil action." (Emphasis added.)

{¶ 34} As with the legislature's use of terms such as "including" in R.C. 149.011(G), which gives breadth to that provision, here it seems clear that the repeated use of the disjunctive "or," accompanied by the terms such as "all records" and "in whole or in part," was a deliberate exercise in expansion.

{¶ 35} In that the General Assembly did not expressly define the term "violation," as noted previously, we will interpret it by looking at the purpose of the specific statute, *White,* 76 Ohio St.3d at 419, 667 N.E.2d 1223, being faithful to the General Assembly's intent in promulgating it, *S.R.,* 63 Ohio St.3d at 594, 589 N.E.2d 1319, and by giving effect to the "usual, normal and customary meaning" of the term being interpreted. *Pennington,* 75 Ohio St.3d at 173, 661 N.E.2d 1049.

{¶ 36} Given the foregoing recitation of the purpose of Ohio's public-records scheme and its inextricable link to notions of open government and sound democracy, it is not necessary to reiterate them again here. It suffices to say that the legislature clearly was aware of the critical importance and value of public records, and its intent was to protect and preserve them. Further, we must presume that the General Assembly used "violation" in accordance with its common meanings: "Injury," a "breach of right, duty or law," Black's Law Dictionary (6th Ed.1990) 1570; an "act of breaking, infringing, or transgressing the law." Id., citing *Rabon v. South Carolina State Highway Dept.* (1972), 258 S.C. 154, 157, 187 S.E.2d 652.

{¶ 37} Despite the clarity of purpose and wording in the statute, petitioner obfuscates that simplicity in favor of complex constructions. Petitioner infuses more than a plain meaning into "violation" while simultaneously suspending any meaning in the phrase "in whole or part," which must be presumed to mean any partial or complete destruction, removal, mutilation, or transfer of or other damage to a record.[4] Petitioner argues that a "violation" of the statute can be determined only by looking on a case-by-case basis at the function of the documents, the number of documents destroyed, and the number of people aggrieved by the destruction.

{¶ 38} Given the vital purposes served by public records, it strains credulity to assert, yet alone believe, that the General Assembly had such a definition in mind when it promulgated the penalty section of the Public Records Act. Petitioner offers no persuasive authority, and we are aware of none, that supports such semantic acrobatics. There is no support for the contention that a violation is predicated or dependent on the function of the document.

---

4. Even if the comp-time sheet was not an independent "record" for purposes of the Public Records Act, a "violation" of the statute occurred each time a time sheet was destroyed because each time sheet was part of the larger public record, and the Act proscribes any destruction, in whole or in part. R.C. 149.351(A).

{¶ 39} Though Akron itself subjectively may see greater value in compilations than in raw data, those value judgments are irrelevant to whether the destruction here constituted a single violation of the Public Records Act or more than 850 violations. What Akron believes to be valuable is not necessarily what the law protects. See *Armstrong v. Executive Office of the President, Office of Administration* (C.A.D.C.1993), 1 F.3d 1274, 1283–1284, fn. 7. The purpose of the public official or agency in creating the document is irrelevant to whether a violation of the Act took place.

{¶ 40} So, too, is the number of people harmed by the destruction. Although respondents perhaps were most directly affected by the destruction of these records, harm also flowed to the taxpayers of Akron, who are entitled to look at the records to ascertain whether their public servants worked the hours for which they were paid and whether their elected officials and those officials' designees were properly ensuring sufficient work for the pay, and to all Ohioans (who own the records). As the statute's plain wording declares, any person aggrieved may seek relief. See R.C. 149.43(C).

{¶ 41} At best, petitioner's suggestion that the definition of "violation" must entail a case-by-case inquiry into the function of the document and must reference the number of transactions of destruction and the number of people aggrieved by the destruction is unworkable; at worst, it is nonsensical. Indeed, to accept its interpretation of the statute would have the practical effect of rewarding certain forms of wrongdoing—the very wrongdoing the legislature so clearly intended to proscribe. It defies logic to believe that the General Assembly intended for more sophisticated participants in the unlawful destruction of public documents to escape the more serious penalties (a forfeiture linked to each document destroyed) simply by premeditating a wholesale destruction of hundreds or thousands of documents in one single event or transaction, while the hapless or inadvertent spoliator who destroys five documents at five different times would face five times the penalty.[5] We refuse to believe that the legislature intended the statute to be read in a manner that rewards the more efficient offender. Given that one of the legislature's purposes in promulgating the Public Records Act was to preserve records and expose government activity to public scrutiny, it clearly did not intend to countenance the destruction of those same

---

5. Although not dispositive to the outcome here, it bears mentioning that the petitioner's employee destroyed public records that were also evidence critical to the respondents' federal fair-labor-practice claims. It is a fundamental tenet of American law that relevant evidence—which, without doubt, these records were—promotes the ascertainment of truth and the integrity and fairness of the adversary process. Destruction of such evidence inflicts the greatest prejudice on all concerned.

records through a penalty section that would in effect reward one who is better at destruction.

{¶ 42} Rather than agreeing with the strained and illogical definition posed by petitioner, we agree with amici curiae and respondents that the General Assembly intended the definition of "violation" to be simple and direct. We conclude, and advise the federal appeals court, that "violation," as used in R.C. 149.351(B), means "any attempted or actual removal, mutilation, destruction, or transfer of or damage to a public record that is not permitted by law."

{¶ 43} In so concluding, we are cognizant of petitioner's suggestion that broad construction of the terms "record" and "violation" may portend fiscal peril for Ohio municipalities. The risk identified by petitioner is predicated, of course, on occurrences like the instant one—a wholesale destruction of hundreds of records that were mandated by law to be preserved. Such events, we hope, are rare in government operations. If not, it is a problem of the offenders' own making, for the Public Records Act is not a new creature imposing unforeseen obligations. Rather, it is an embodiment of certain privileges and concomitant obligations of governing in a democracy. In any event, the petitioner's argument is not one for this court to entertain.

{¶ 44} Our role is to interpret existing statutes, not rewrite them. And our jurisprudence on the interpretation of public-records statutes is clear. We reaffirm that the General Assembly is the ultimate arbiter of policy considerations relevant to public-records laws, *Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 21, and it is for the legislature to "weigh[ ] and balance[ ] the competing public policy considerations between the public's right to know how its state agencies make decisions and the potential harm, inconvenience or burden imposed on the agency by disclosure." *State ex rel. James v. Ohio State Univ.* (1994), 70 Ohio St.3d 168, 172, 637 N.E.2d 911. The dissent is well aware of that legislative prerogative and that the General Assembly is free to alter the public-records statute, as it has done previously, in response to this opinion. See *State ex rel. Fostoria Daily Rev. Co. v. Fostoria Hosp. Assn.* (1988), 40 Ohio St.3d 10, 11, 531 N.E.2d 313.

Judgment accordingly.

MOYER, C.J., RESNICK and PFEIFER, JJ., concur.

LUNDBERG STRATTON, O'DONNELL and LANZINGER, JJ., dissent.

---

**LANZINGER, J., dissenting.**

{¶ 45} I am troubled that in answering the two certified questions, the majority has broadened the term "record" beyond the statutory definition and has exposed

municipalities, townships, and state agencies to potentially crippling penalties for even inadvertent violations of the public-records law.

{¶ 46} The General Assembly has provided a far-ranging definition of the term "records" in R.C. 149.011(G). · " 'Records' includes any document, device, or item, regardless of physical form or characteristic, including an electronic record * * *, created or received by or coming under the jurisdiction of any public office of the state or its political subdivisions, which serves to document the organization, functions, policies, decisions, procedures, operations, or other activities of the office." Id.

{¶ 47} Until now, the statutory meaning of "record" has depended on the function of the item involved. Whatever form it took, the item was expected "*to document* the organization, functions, policies, decisions, procedures, operations, or other activities of the office." (Emphasis added.) R.C. 149.011(G). Inexplicably, however, the majority now holds that a record need merely be "used" by a public office or official in the activities of the office, and it eliminates the statutory requirement that the item actually "serve[ ] to document" those activities. Conceivably, virtually any piece of paper that passes through a public office is now transformed into a public record. Even a single piece of incoming mail is a public record, since it may be considered "received or used" in the operations of the office, although it may not serve to document any of the activities of that office.

{¶ 48} R.C. 149.38 through 149.42 identify what public records must be kept safe and available by government agencies in fulfilling their duty under R.C. 149.351(A), which prohibits destruction of or damage to public records. A public office opens itself to risk of severe penalty if it fails to meet the duty of protecting its public records to ensure the broad access to which the people of Ohio are entitled. R.C. 149.351(B) gives a remedy to "[a]ny person who is aggrieved by the removal, destruction, mutilation, or transfer of, or by other damage to or disposition of a record" or by the threat of such removal or destruction. The aggrieved person may file a civil action for injunctive relief or a civil action for forfeiture of $1,000 for each violation, or both. An award of reasonable attorney fees will accompany either judgment. R.C. 149.351(B)(1) and (2).

{¶ 49} Thus, the General Assembly created a significant remedy for the unlawful destruction of public records. The $1,000 forfeiture depends upon proof of a "violation"; unfortunately, that term is undefined. Notably, the statute does not award a $1,000 forfeiture fee for *each record* destroyed or for *each document* altered. Destruction of a record gives the person aggrieved by that destruction the choice of remedy for each *violation.*

{¶ 50} In this case, I cannot accept that each single comp-time sheet is an individual record. I believe that only when these forms are compiled do they serve to "document the organization, functions, policies, decisions, procedures,

operations, or other activities" of the city of Akron's Plans and Permits Division. R.C. 149.011(G). Therefore, the "record" is the comp-time file for each single employee and the ledger of all employees' comp-time, as R.C. 149.011(G) delineates. Destruction or disappearance of or damage to the record (in whole or in part) is the violation, which then subjects the public office to the consequences of R.C. 149.351(B). Either one missing piece of paper or multiple missing pages constitute a "violation." The function of *documentation* of the activities of the office determines whether a specific page forms part of a single record or becomes a separate record in and of itself.

{¶ 51} At most, three records were affected here—each respondent's comp-time record, which included a compilation of comp-time sheets, and the tally book—all of which were to be completely furnished upon request. Each incomplete record is a violation subject to the $1,000 forfeiture plus attorney fees upon prevailing in a civil action under R.C. 149.351(B).

{¶ 52} Although the issue is beyond the scope of the holding, I wish to note my due-process concerns. We have already recognized that R.C. 149.351(B) is an example of an explicit penalty or forfeiture rather than damages. *Rosette v. Countrywide Home Loans, Inc.*, 105 Ohio St.3d 296, 2005-Ohio-1736, 825 N.E.2d 599, ¶ 14. The United States Supreme Court has held that the Eighth Amendment's prohibition against excessive fines applies to the states and prohibits them from imposing "grossly excessive" punishments on tortfeasors. *BMW of N. Am. v. Gore* (1996), 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809. In determining whether a penalty is grossly excessive, a court is to consider three points: (1) the degree of the defendant's reprehensibility or culpability, (2) the disparity between the penalty and the harm to the victim caused by the defendant's actions, and (3) the difference between the remedy and the civil penalties authorized in other cases for comparable misconduct. Id. at 575, 116 S.Ct. 1589, 134 L.Ed.2d 809.

{¶ 53} First, as to culpability, our statute does not distinguish between malevolent and inadvertent destruction of documents—an aggrieved party is not required to show any specific motive or intent before a violation is established. Second, as to relationship between penalty and harm, Kish was awarded actual damages of $500 for spoliation and a penalty of $480,000. Elder's actual damages were also $500 for spoliation, and her award was supplemented by a penalty of $380,000. The relationship between penalty and harm is undeniably weak. Third, as to other cases, if this case is a harbinger, the majority's definition of "record" and its interpretation of "violation" under R.C. 149.351(B) may lead to catastrophic financial consequences for municipalities, townships, and agencies. In this case, on damages of $1,000, a forfeiture *nearly 900 times* greater is authorized by the majority. In my view, common sense abhors such a result.

{¶ 54} Because I believe that the majority has expanded the definition of "record" beyond the statutory definition and that whether a specific page, form, or document is part of a record or is, in itself, a separate record is determined by the function of documentation of the public office's activities and that the record's destruction, damage, or disappearance (in whole or in part)—or threat of the same—is the potential "violation" for purposes of R.C. 149.351, I respectfully dissent.

LUNDBERG STRATTON and O'DONNELL, JJ., concur in the foregoing opinion.

---

Max Rothal, Akron Law Director, and Bruce H. Christensen Jr. and Deborah M. Forfia, Assistant Law Directors; and Brennan, Manna & Diamond and John N. Childs, for petitioner.

Wegman Hessler & Vanderburg, Jennifer A. Corso, David R. Knowles, and Christopher A. Holecek; and Warner Mendenhall, for respondents.

John Gotherman, Barry M. Byron, and Stephen L. Byron, for amicus curiae, Ohio Municipal League, in support of petitioner.

Gittes & Schulte and Frederick M. Gittes; Thompson & Bishop and Christy B. Bishop, for amici curiae, Ohio Civil Rights Coalition, Ohio NOW Legal Defense and Education Fund, Committee Against Sexual Harassment, and Ohio Employment Lawyers Association, in support of respondents.

Baker & Hostetler, L.L.P., and David Marburger, for amici curiae, Ohio Newspaper Association and Ohio Coalition for Open Government, in support of respondents.