O'Connor, C.J.
*63 {¶ 1} In these related original actions, relators, Cincinnati Enquirer ("the Enquirer") and GateHouse Media Ohio Holdings II, Inc., d.b.a. Columbus Dispatch, and reporter Holly R. Zachariah (collectively, "the Dispatch"), filed complaints seeking a writ of mandamus to compel the release of unredacted reports on the autopsies of the eight members of the Rhoden and Gilley families who were murdered in Pike County in April 2016. Separately, the Enquirer *399 moved for oral argument and the Dispatch moved to compel access to the unredacted autopsy reports filed under seal with this court. And the Dispatch and the Enquirer both seek an award of attorney fees and statutory damages for what they characterize as the untimely production of the redacted autopsy reports. We deny the writ, the motions, and the requests for attorney fees and statutory damages.
I. FACTS AND PROCEDURAL HISTORY
{¶ 2} On April 22, 2016, eight people, all of whom were members of the Rhoden or Gilley families, were found dead in Pike County, Ohio. Over the next two days, the chief deputy coroner of Hamilton County conducted autopsies on the decedents.
*64 Respondent Pike County Coroner's Office ("PCCO") received the final autopsy reports on July 22, 2016.
{¶ 3} The Dispatch made a verbal request to PCCO and respondent David Kessler, M.D., the Pike County coroner, to inspect the final autopsy reports, pursuant to R.C. 149.43 and 313.10. PCCO denied the request.
{¶ 4} On July 26, 2016, the Dispatch then e-mailed a public-records request for the final autopsy reports to PCCO and the attorney general, again citing R.C. 149.43 and 313.10. On the same day, Robert Strickley Jr., a reporter for the Enquirer, e-mailed a request for the final autopsy reports to PCCO, citing R.C. 149.43.
{¶ 5} Also that same day, Dr. Kessler issued a press release in which he confirmed that his office was in possession of all eight final autopsy reports but denied all media requests for them. Dr. Kessler stated that the final autopsy reports were exempt from disclosure as "confidential law enforcement investigatory records."
{¶ 6} On July 29, 2016, the Enquirer filed in this court an original action against PCCO seeking a writ of mandamus to compel release of the final autopsy reports. On August 8, 2016, the Dispatch filed a separate original action in this court seeking the same relief. Both suits were filed before Dr. Kessler and the attorney general's office released redacted copies of the eight final autopsy reports on September 23, 2016. The unredacted final autopsy reports have not been released.
{¶ 7} After unsuccessful mediation attempts, PCCO moved to dismiss both actions. On February 22, 2017, we unanimously denied the motions to dismiss and granted alternative writs of mandamus directing the parties to submit evidentiary materials and merit briefs. 148 Ohio St.3d 1406, 2017-Ohio-573, 69 N.E.3d 747.
{¶ 8} Before the parties submitted their briefs, PCCO moved to submit unredacted copies of the autopsy reports and explanatory materials under seal for this court's in camera inspection. We granted the motion in part, permitting the unredacted autopsy reports to be filed under seal but without additional explanatory materials. 148 Ohio St.3d 1440, 2017-Ohio-1427, 72 N.E.3d 655. PCCO filed the unredacted autopsy reports under seal on May 3, 2017. The next day, the Dispatch moved to compel access to the sealed autopsy reports. On April 11, 2017, the Enquirer filed an unopposed request for oral argument.
II. ANALYSIS
A. Request for oral argument
{¶ 9} We have discretion to determine whether an original action merits oral argument. S.Ct.Prac.R. 17.02(A). In exercising that discretion, we consider *65 whether the case involves a matter of great public importance, complex issues of law or fact, a substantial constitutional issue, *400 or a conflict among the courts of appeals. State ex rel. BF Goodrich Co., Specialty Chems. Div. v. Indus. Comm. , 148 Ohio St.3d 212, 2016-Ohio-7988, 69 N.E.3d 728, ¶ 23.
{¶ 10} This case involves a matter of great public importance: whether autopsy reports in open homicide investigations are public records and therefore available for public inspection. However, the remaining factors are not present. The case presents no constitutional question or division among the intermediate appellate courts, the relevant facts are few and uncontested, and the legal questions in the case are all matters of statutory interpretation that the parties have extensively briefed. Accordingly, we deny the Enquirer's request for oral argument.
B. Motion to compel access
{¶ 11} We have consistently required in camera inspection of requested documents before determining whether they are exempt from disclosure under the Public Records Act, R.C. 149.43. Salemi v. Cleveland Metroparks , 145 Ohio St.3d 408, 2016-Ohio-1192, 49 N.E.3d 1296, ¶ 33. The Dispatch contends that it has a due-process right to participate in that inspection. But we considered and rejected the same argument in State ex rel. Lanham v. DeWine , 135 Ohio St.3d 191, 2013-Ohio-199, 985 N.E.2d 467 :
If the court were to require the disclosure of the subject records in discovery to permit relator to contest the applicability of a claimed exception, it would render the case moot. And [relator] can still contest the applicability of a claimed exception by challenging the validity of unsealed evidence that the public-records custodian submits to support its reliance on the exception. * * * Thus, due process does not prevent the court's consideration of the pertinent records submitted under seal for in camera review.
(Citation omitted.) Id. at ¶ 23. The Dispatch has not offered any basis to distinguish its asserted due-process right from that considered in Lanham. Thus, we deny the motion to compel access.
C. The public-records mandamus petitions
1. Overview
{¶ 12} After conducting an autopsy, the coroner, deputy coroner, or pathologist must file in the coroner's office a detailed written report describing the observations made during the autopsy and the conclusions drawn therefrom.
*66 R.C. 313.13(A). Once filed, that report is expressly defined as a public record and therefore is available for public inspection. R.C. 313.10(A)(1) and (B).
{¶ 13} But R.C. 313.10(A)(1) is subject to multiple exceptions. One of those exceptions provides that "[r]ecords of a deceased individual that are confidential law enforcement investigatory records ['CLEIR'] as defined in section 149.43 of the Revised Code" are not public records. R.C. 313.10(A)(2)(e).
{¶ 14} The Dispatch and the Enquirer argue that as a matter of statutory construction, final autopsy reports can never qualify as CLEIR. And even assuming that the CLEIR exception can apply to some autopsy reports, the newspapers deny that any information contained in the Rhoden and Gilley reports actually satisfies the exception. This latter claim requires us to review the specific information that PCCO redacted from the autopsy reports submitted under seal.
*401 2. Standard of review
{¶ 15} Mandamus is the appropriate remedy by which to compel compliance with the Public Records Act. State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees , 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶ 6. The Public Records Act "is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records." State ex rel. Cincinnati Enquirer v. Hamilton Cty. , 75 Ohio St.3d 374, 376, 662 N.E.2d 334 (1996). Exceptions to disclosure under the act are strictly construed against the record's custodian, who has the burden to establish the applicability of any claimed exception. State ex rel. Cincinnati Enquirer v. Jones-Kelley , 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, ¶ 10.
3. Analysis
{¶ 16} Under the Public Records Act, "[c]onfidential law enforcement investigatory records" are exempt from disclosure. R.C. 149.43(A)(1)(h). And although the coroner's-records statute, R.C. 313.10(A)(1), generally deems "the records of the coroner" public records, the statute contains an exception for "[r]ecords of a deceased individual that are confidential law enforcement investigatory records," R.C. 313.10(A)(2)(e). The coroner's-records statute cross-references the Public Records Act and incorporates its definition of CLEIR. Id.
a. Records of a deceased individual
{¶ 17} We first determine whether autopsy reports qualify as "[r]ecords of a deceased individual" pursuant to R.C. 313.10(A)(2)(e). That phrase, according to the Enquirer, "refers to a decedent's records, created prior to death, that come into the possession of the coroner." Autopsy reports, the newspapers argue, are *67 "records of the coroner" and are not protected from disclosure pursuant to R.C. 313.10(A)(2)(e).
{¶ 18} The Enquirer's definition is unpersuasive. Notably, the newspapers argue that documents must be prepared by law enforcement in order to qualify as CLEIR. But if that were correct, then such documents could never simultaneously be "[r]ecords of a deceased individual" as the Enquirer wishes to define the phrase. In other words, no document could ever satisfy the R.C. 313.10(A)(2)(e) CLEIR exception as it is construed by the Dispatch and the Enquirer.
{¶ 19} Unsurprisingly, the Enquirer offers no support for its claim that "[r]ecords of a deceased individual" includes only documents possessed by the deceased and created prior to death. And the Enquirer's statutory argument relies on an unreasonably narrow construction of the word "of." According to the Enquirer, R.C. 313.10, and R.C. Chapter 313 more generally, "consistently use[ ]" the preposition "of" to "connote possession, ownership, or belonging." For example, the Enquirer contends, "the records of the coroner," as used in R.C. 313.10(A)(1), plainly means records belonging to the coroner, not records about or referring to the coroner. The Enquirer also points to the phrase "the body or remains of a deceased person," which appears repeatedly in R.C. 313.08.
{¶ 20} But the Enquirer oversimplifies the Revised Code's use of the preposition. R.C. 313.10(A)(2)(b) exemplifies the erroneous nature of the Enquirer's narrow interpretation of the word "of." That statute provides that "[p]hotographs of a decedent made by the coroner or by anyone acting under the coroner's direction or supervision" are not public records. (Emphasis added.) R.C. 313.10(A)(2)(b). Plainly, in this sentence, "of" means "about" or "depicting" the decedent, not "belonging to" the decedent.
*402 {¶ 21} Apparently recognizing the flaw in its narrow construction of the word "of," the Enquirer implies that the phrase "[r]ecords of a deceased individual" may be ambiguous. It is our practice to resolve any doubts concerning the interpretation of the Public Records Act in favor of disclosure. State ex rel. Glasgow v. Jones , 119 Ohio St.3d 391, 2008-Ohio-4788, 894 N.E.2d 686, ¶ 13. When statutory language is ambiguous, it is appropriate to consider the legislative history. But there, too, the Enquirer's argument is undermined. In 2009, when the General Assembly amended R.C. 313.10 to insert the "[r]ecords of a deceased individual" language, the bill announced that one purpose of the act was "to specify that certain records of a decedent relating to the criminal investigation of the decedent's death are not public records." 2008 Sub.H.B. No. 471. The act made two relevant changes to the statute: it added R.C. 313.10(A)(2)(e), the CLEIR exception at issue in this case. And it added R.C. 313.10(A)(2)(f), which excludes from the definition of "public records" "[l]aboratory reports generated *68 from the analysis of physical evidence by the coroner's laboratory that is discoverable under Criminal Rule 16." 2008 Sub.H.B. No. 471. It is logical to conclude that if laboratory reports about the decedent constitute the "records of a decedent" referred to in the bill, then so too would the decedent's autopsy report.
{¶ 22} The newspapers' second statutory argument is vulnerable to the same objection as the first: it is not apparent what records, if any, would remain subject to the R.C. 313.10(A)(2)(e) CLEIR exception if their interpretation prevailed. A decedent's medical and psychiatric records are already exempt from disclosure by another provision of the statute, as is a decedent's suicide note. R.C. 313.10(A)(2)(c) and (d). What other records belonging to a deceased individual might a coroner routinely have in his or her possession? In an affidavit, Special Agent Michael D. Trout of the Ohio Bureau of Criminal Investigation ("BCI") described his personal experience on crime scenes and suggested that the answer is none:
[A]ny personal effects or other items found on a body or in possession of the deceased at the time of death are ultimately collected, bagged, and kept by law enforcement as evidence. The coroner generally does not keep these types of items and the coroner generally does not collect and take evidence at the crime scene, other than the victim's body.
We must presume that the language chosen by the General Assembly was intended to be effective. Thus, we decline to adopt the newspapers' interpretation of "[r]ecords of a deceased individual."
{¶ 23} We hold that an autopsy report is a "[r]ecord[ ] of a deceased individual" within the meaning of R.C. 313.10(A)(2)(e).
b. Confidential law-enforcement investigatory records
{¶ 24} The Public Records Act defines "confidential law enforcement investigatory record[s]" as including
any record that pertains to a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature, but only to the extent that the release of the record would create a high probability of disclosure of any of the following:
* * *
*403 (c) Specific confidential investigatory techniques or procedures or specific investigatory work product.
*69 R.C. 149.43(A)(2).
{¶ 25} PCCO argues that the Rhoden and Gilley autopsy reports constitute "specific investigatory work product" as we defined the term in State ex rel. Dayton Newspapers, Inc. v. Rauch , 12 Ohio St.3d 100, 465 N.E.2d 458 (1984). The facts of Rauch are nearly identical to those presented herein: the Hocking County coroner, Dr. John Rauch, denied a public-records request from the Dayton Daily News for final autopsy reports on two homicide victims. At the time, the coroner's-records statute, R.C. 313.10, did not have its own CLEIR provision, so Dr. Rauch relied on the CLEIR exception in the Public Records Act, former R.C. 149.43(A)(2), Am.Sub.S.B. No. 62, 138 Ohio Laws, Part I, 245, 246 (now R.C. 149.43(A)(1)(h) ). He argued that the autopsy reports were subject to this exception because they contained information that investigators could use in their investigation-namely, descriptions of the types of wounds and the manner of their infliction. Dr. Rauch stated that police could test the credibility of witnesses by comparing their proffered testimony to the details provided in the autopsy reports.
{¶ 26} We unanimously denied the newspaper's petition for a writ of mandamus, agreeing with the coroner that the autopsy reports were "specific investigatory work product" and declaring that "[t]he autopsy is, in itself, an investigation." Rauch at 100, 465 N.E.2d 458. We noted that the report on an autopsy required as a result of a homicide is distinguishable from " 'routine factual reports' " that are subject to disclosure. Id. at 100-101, 465 N.E.2d 458, quoting State ex rel. Beacon Journal Publishing Co. v. Univ. of Akron , 64 Ohio St.2d 392, 398, 415 N.E.2d 310 (1980) ; see also R.C. 313.131(B) (coroner shall perform autopsy only if, in his or her opinion, one is necessary). And we recognized that "the confidentiality of the contents of an autopsy report is essential to its effective use in further investigation by law enforcement personnel." Id. at 101, 465 N.E.2d 458.
{¶ 27} The Dayton Daily News argued that the case should be decided under R.C. 313.10, the more specific statute governing coroner's records, rather than under the Public Records Act. In 1984, when Rauch was decided, R.C. 313.10 declared simply that "[t]he records of the coroner, made by himself or by anyone acting under his direction or supervision [are] public records." G.C. 2855-11, Am.Sub.S.B. No. 92, 121 Ohio Laws 591, 594, recodified as R.C. 313.10. According to the Dayton Daily News, an autopsy report, as a "record of the coroner," was plainly a public record.
{¶ 28} In the second part of the opinion, we rejected the premise of the newspaper's argument and concluded that an autopsy report was not a "record of *70 the coroner" under former R.C. 313.09, the statute describing the records that the coroner was mandated to keep, which stated:
The coroner shall keep a complete record of and shall fill in the cause of death on the death certificate, in all cases coming under his jurisdiction. * * * Such records shall be properly indexed, and shall state the name, if known, of every deceased person * * *, the place where the body was found, date of death, cause of death, and all other available information. The report of the coroner and the detailed findings of the autopsy shall be attached to the report of each case.
*404 Am.H.B. No. 750, 136 Ohio Laws, Part II, 2976. We construed this section to mean that an autopsy report was "an item separate from the other information the coroner is required to keep as a public record" and therefore was not subject to disclosure in the same manner. Rauch , 12 Ohio St.3d at 101, 465 N.E.2d 458.
{¶ 29} We definitively held in Rauch that information in some autopsy reports can be critical to an ongoing homicide investigation and therefore exempt from disclosure as CLEIR. The Dispatch and the Enquirer vigorously contend that Rauch has been superseded by subsequent amendments to R.C. 313.10. While that may be true in part, the General Assembly's post- Rauch amendments to R.C. 313.10 demonstrate a legislative desire to exempt some records maintained by the coroner's office from disclosure as CLEIR, just as we described in Rauch .
{¶ 30} The General Assembly has amended the coroner's-records statute, R.C. 313.10, twice since we decided Rauch . First, in 2006, the legislature added language bringing autopsy reports within the definition of public records. Am.Sub.H.B. No. 235, 151 Ohio Laws, Part IV, 7190, 7192. As a result, R.C. 313.10 now expressly states that "the detailed descriptions of the observations written during the progress of an autopsy and the conclusions drawn from those observations" are public records. R.C. 313.10(A)(1). Further reinforcing the point, the amended statute excludes preliminary autopsy reports from the definition of public records, R.C. 313.10(A)(2)(a), but contains no comparable exemption for final autopsy reports. As a result of the 2006 amendments, we conclude that our holding in Rauch that an autopsy report is not a "record of the coroner" is no longer valid.
{¶ 31} However, the General Assembly amended the coroner's-records statute again in 2009, adding the CLEIR exception in R.C. 313.10(A)(2)(e) that did not exist when Rauch was decided. 2008 Sub.H.B. No. 471 (effective Apr. 7, 2009). The new language in R.C. 313.10 declares that "the following records in a coroner's office are not public records: * * * [r]ecords of a deceased individual *71 that are confidential law enforcement investigatory records as defined in section 149.43 of the Revised Code." R.C. 313.10(A)(2)(e).
{¶ 32} Thus, the General Assembly, through the addition of R.C. 313.10(A)(2)(e), endorsed what we had held in the first half of Rauch -that at least some autopsy reports remain protected from disclosure, at least for a temporary period, because they are CLEIR.
{¶ 33} Whether a document satisfies the CLEIR exception is determined by a two-part test: (1) whether the record is a confidential law-enforcement record and (2) whether release of the record would create a high probability of disclosure of any one of the statutorily enumerated types of information that is exempt from public disclosure. See State ex rel. Musial v. N. Olmsted , 106 Ohio St.3d 459, 2005-Ohio-5521, 835 N.E.2d 1243, ¶ 18-19. (Although the first dissenting opinion argues that we invented this two-part test in State ex rel. Steckman v. Jackson , 70 Ohio St.3d 420, 639 N.E.2d 83 (1994), it dates back to at least State ex rel. Polovischak v. Mayfield , 50 Ohio St.3d 51, 52, 552 N.E.2d 635 (1990). See State ex rel. Beacon Journal Publishing Co. v. Maurer , 91 Ohio St.3d 54, 56, 741 N.E.2d 511 (2001), citing Polovischak at 52, 552 N.E.2d 635.) Of the types of protected CLEIR, PCCO asserts that the Rhoden and Gilley autopsy reports contain "[s]pecific confidential investigatory techniques or procedures or specific investigatory work product," R.C. 149.43(A)(2)(c).
*405 {¶ 34} The Dispatch and the Enquirer argue that final autopsy reports can never reveal specific investigatory work product because the coroner is not a law-enforcement official. This argument is unavailing. In attempting to support this claim, the Enquirer misconstrues this court's opinion in Steckman , arguing that we required in that case "that 'specific investigatory work product' be 'prepared by law enforcement officials.' " We did not impose that requirement in Steckman . Instead, we recited the work-product rule, quoted the description in Black's Law Dictionary of materials exempt from disclosure under that rule-" 'any notes, working papers, memoranda or similar materials, prepared by attorneys [here, by law enforcement officials] in anticipation of litigation' "-and applied it to cases involving records held by law-enforcement officials. (Brackets sic.) Steckman at 434, 639 N.E.2d 83, quoting Black's Law Dictionary 1606 (6th Ed.1990).
{¶ 35} Indeed, the relevance of Steckman to this case is limited, at best. In Steckman , we specifically addressed "the use (and attempted use) of R.C. 149.43 (public records law) as a vehicle to obtain records from law enforcement officials and the contents of the files of prosecutors in pending criminal cases." Id. at 421, 639 N.E.2d 83. We "emphasize[d]" that the "decision only affects public records involved in pending criminal proceedings as that term is hereinafter construed." Id. at 426, 639 N.E.2d 83. The question before us today relates to an attempt to obtain records from a coroner's office in a probable , but not yet pending, criminal case. Indeed, none of *72 the cases cited in Steckman concerned an effort to obtain records from a coroner's office, and the General Assembly did not even apply the CLEIR exception to coroner's records until 2009, 15 years after Steckman interpreted the exception as applied to law-enforcement officials and prosecutors.
{¶ 36} Although Steckman construed the CLEIR exception as it pertains specifically to records sought from law-enforcement agencies and prosecutors' offices, the Public Records Act defines CLEIR as any "record[s] that pertain [ ] to a law enforcement matter." (Emphasis added.) R.C. 149.43(A)(2). "[T]he statutory definition of [CLEIR] focuses on the nature of the record rather than upon the nature of the individual or agency holding the record." Polovischak , 50 Ohio St.3d at 53, 552 N.E.2d 635. In Polovischak , we specifically extended CLEIR protection to records compiled by the Bureau of Workers' Compensation's Internal Security Committee, which had authority to investigate " 'all claims or cases of criminal violations, abuse of office, or misconduct on the part of bureau or [Industrial] [C]ommission employees.' " (Emphasis sic.) Id. at 52-53, 552 N.E.2d 635, quoting former R.C. 4121.122(D), Am.Sub.H.B. No. 222, 143 Ohio Laws, Part II, 3197, 3280. We reached this conclusion despite the facts that the investigative authority was not exercised by law-enforcement officials and was not restricted to investigating criminal violations. See also State ex rel. Mahajan v. State Med. Bd. of Ohio , 127 Ohio St.3d 497, 2010-Ohio-5995, 940 N.E.2d 1280, ¶ 50-53 (memorandum prepared by the State Medical Board's chief enforcement attorney protected from disclosure under the Public Records Act by the CLEIR exception for specific investigatory work product).
{¶ 37} Indeed, if the only records that qualify as CLEIR are those prepared by law enforcement, then R.C. 313.10(A)(2)(e) would shield nothing. There is no evidence that police investigators routinely leave their investigative reports in the custody of the coroner. If reports prepared by the *406 coroner do not qualify as CLEIR, then R.C. 313.10(A)(2)(e) becomes a dead letter. We must presume that the General Assembly intended the entire coroner's-records statute to be effective. R.C. 1.47(B).
{¶ 38} And there is no doubt that the nature of the coroner's work in a homicide-related autopsy is investigative and pertains to law enforcement. The General Assembly has recognized that a coroner plays an integral role in law-enforcement investigations. For instance, to determine the cause of death, the coroner may issue subpoenas for witnesses, administer the witness oath, and inquire of witnesses how a death occurred. R.C. 313.17. The coroner may even commit witnesses to jail under certain circumstances, and a judge can, on the coroner's application, compel compliance on threat of contempt. Id. It cannot be said that the coroner lacks authority to investigate a violation of law when, *73 without the coroner's investigation, a murder could be mistaken for a natural death and no legal violation would be uncovered.
{¶ 39} As part of the coroner's efforts to determine whether the law was violated, the coroner may gather evidence and submit it to BCI as part of the investigation. R.C. 313.08(I). And in cases "in which, in the judgment of the coroner or prosecuting attorney, further investigation is advisable" (emphasis added), the coroner is statutorily required to "promptly deliver, to the prosecuting attorney of the county in which [the] death occurred, copies of all necessary records relating to [the] death." R.C. 313.09 ; see also R.C. 313.12(A) ("When any person dies as a result of criminal or other violent means * * * or in any suspicious or unusual manner, * * * the physician called in attendance, or any member of an ambulance service, emergency squad, or law enforcement agency who obtains knowledge thereof arising from the person's duties, shall immediately notify the office of the coroner of the known facts concerning the time, place, manner, and circumstances of the death, and any other information that is required pursuant to sections 313.01 to 313.22 of the Revised Code"). It is unreasonable to argue that a coroner, conducting a preliminary investigation to determine whether an offense was committed-for instance, whether a cardiac-arrest death was caused by a heart attack or a poisoning-is not participating in a law-enforcement investigation.
{¶ 40} Here, the unredacted portions of the autopsy reports contain substantial information, including the cause of death for each victim, general information about injuries, and observations about the victims' bodies including detailed descriptions of various organs. Among the redacted information are specific facts about gunshot wounds including the path and trajectory of bullets, specific identifying information such as scars or tattoos, descriptions of body placement, and toxicology results. The investigation into the deaths of these victims is ongoing.
{¶ 41} PCCO submitted affidavits of Dr. Kessler and BCI Special Agent Trout to explain the investigative nature of the autopsy reports and their relevance to the ongoing criminal investigation. Dr. Kessler averred that the "information in the * * * final autopsy reports reflect [sic] the type of specific information used by law enforcement to investigate a homicide." For instance, according to Dr. Kessler, "law enforcement can use the location and direction of * * * bullet wounds and tracks to recreate the scene of death." Toxicology reports can determine whether drugs "may be a contributing factor to the death, and might play a role in law enforcement's investigation." In some cases, "strangulation marks left on the body * * * might *407 indicate if one or more people were involved in the death [which] helps the law enforcement investigation move forward." *74 {¶ 42} Special Agent Trout described how the information contained in the Rhoden and Gilley autopsy reports can be used by law enforcement. According to Special Agent Trout, "[d]ecomposition can tell investigators many things such as time of death, conditions that the body was subjected to after death, and the time elapsed between death and autopsy." And "information from the coroner about the victims' wounds can give investigators a lot of details about how the crimes were committed and what was happening in the scene as the shots were fired. Other than the investigative team, only the perpetrator(s) of the crimes knows these details." Other redacted information "can potentially tell investigators what kind of gun and ammunition was used, other details about the perpetrator or the scene of death, and results of toxicology or other forensic information." "Information from final autopsy reports can also be used to triage tips." Investigators can compare autopsy information to that provided by alleged witnesses to evaluate their credibility. And Special Agent Trout advised that "[w]hen critical pieces of information are readily available in the media/public, it can be almost impossible to determine if a person is speaking from actual personal knowledge or just regurgitating what they have seen in the news or on social media."
{¶ 43} In Rauch , we acknowledged that the confidentiality of the contents of an autopsy report is "essential to its effective use in further investigation by law enforcement personnel." 12 Ohio St.3d at 100, 465 N.E.2d 458. Based on our review of the Rhoden and Gilley autopsy reports and the sworn statements of Dr. Kessler and Special Agent Trout, it is clear that the information redacted from the reports is precisely the type of information shielded from disclosure in Rauch due to its investigative value to law enforcement. See also State ex rel. Cincinnati Enquirer v. Dept. of Pub. Safety , 148 Ohio St.3d 433, 2016-Ohio-7987, 71 N.E.3d 258, ¶ 45 (emphasizing relevance of investigative value to public-records determination and recognizing that dash-cam-recording images with "concrete investigative value" may be withheld while images with little or no investigative value must be disclosed). As Special Agent Trout emphasized, the value of that information to investigators will be lost if it is prematurely disclosed.
{¶ 44} Applying the standard we set forth in Rauch , we conclude that the redactions to the final Rhoden and Gilley autopsy reports were made to protect records of the deceased that are CLEIR. Therefore, the information is exempt from public disclosure pursuant to the CLEIR exception while the investigation is ongoing. Accordingly, the Rhoden and Gilley reports satisfy both elements of the exception to disclosure under the coroner's-records statute.
c. The Confrontation Clause
{¶ 45} The Enquirer argues that interpreting the CLEIR exception, R.C. 313.10(A)(2)(e), as encompassing final autopsy reports will conflict with our Sixth Amendment jurisprudence. This is not so. Whether portions of a final autopsy *75 report constitute CLEIR exempt from public disclosure and whether a final autopsy report is admissible at trial are distinct questions. It would be inappropriate to use one analysis for the other.
{¶ 46} The Confrontation Clause of the Sixth Amendment to the United States Constitution prohibits the admission of "testimonial statements" of a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity for *408 cross-examination. Crawford v. Washington , 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). But the United States Supreme Court has noted that business records are not testimonial in nature and thus may be admitted without violating a defendant's Sixth Amendment rights. Id. at 56, 124 S.Ct. 1354. We have previously held that an autopsy report is admissible as a nontestimonial business record without the testimony of the medical examiner who conducted the autopsy. State v. Craig , 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 88.
{¶ 47} The Enquirer essentially argues that if we conclude that autopsy reports qualify as CLEIR-and therefore that they are prepared for the primary purpose of accusing a targeted individual or to provide evidence at a criminal trial-then they cannot be nontestimonial business records. But a plurality of the United States Supreme Court rejected a similar claim in Williams v. Illinois , 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). In Williams , a majority of the court determined that a DNA-profile report was nontestimonial. Although no majority of the court agreed on a single reason for the determination, a plurality opinion authored by Justice Alito and joined by Chief Justice Roberts, Justice Kennedy, and Justice Breyer concluded that the report was nontestimonial because its "primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time," id. at 84, 132 S.Ct. 2221.
{¶ 48} We considered a similar question in State v. Maxwell , 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, and concluded that
an autopsy report that is neither prepared for the primary purpose of accusing a targeted individual nor prepared for the primary purpose of providing evidence in a criminal trial is nontestimonial, and its admission into evidence at trial under Evid.R. 803(6) as a business record does not violate a defendant's Sixth Amendment confrontation rights.
Id. at ¶ 63.
{¶ 49} It cannot be disputed that a law-enforcement investigatory purpose is a different, broader category than a trial-preparation purpose such as gaining evidence against a defendant or accusing a targeted individual. Indeed, the *76 plurality opinion in Williams , using a narrower version of the primary-purpose test than we have adopted in Ohio, identified one investigatory purpose-to catch an unknown perpetrator-that is not a trial-preparation purpose.[1] And there is no doubt, under our above analysis, that an autopsy with such a purpose would be investigatory and that the information in the report would be subject to redaction pursuant to the CLEIR exception. Indeed, as Special Agent Trout explained, information contained in such a report could be used to triage tips, narrow in on persons of interest, and test the credibility of those claiming to have knowledge of the crime.
{¶ 50} On the other hand, an autopsy report that is "prepared for the primary purpose of accusing a targeted individual" may also contain information, such as bullet trajectories known only to the perpetrator, that would still be detrimental to the investigation if publicized before the perpetrator's arrest, and such information *409 may still be withheld under the CLEIR exception.
{¶ 51} This comparison evinces why two separate analyses are necessary-one to determine whether an autopsy report contains CLEIR and another to determine whether it is admissible at trial as a business record. Neither analysis controls the other.[2] Whether the Rhoden and Gilley autopsy reports would be admissible at trial is an entirely different question from the one we consider here concerning whether the reports are public records and therefore subject to public disclosure.
{¶ 52} Once a perpetrator is identified and discovery commences in a criminal case, a different analysis will control the disclosure of autopsy reports, both as to the public and to the defendant. Further, the trial judge will be responsible for determining the admissibility of the reports during judicial proceedings. Thus, whether an autopsy report may be admitted as a business record at trial and whether it must, almost certainly, be disclosed pursuant to Crim.R. 16 does not *77 answer whether the report meets the CLEIR exception for purposes of public-records disclosure.
d. Availability of CLEIR in autopsy reports upon conclusion of investigation
{¶ 53} In reaching our decision today, we do not forget Justice Brandeis's maxim that " '[s]unlight is said to be the best of disinfectants,' " Buckley v. Valeo , 424 U.S. 1, 67, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), quoting Brandeis, Other People's Money and How the Bankers Use It 62 (1933). Indeed, we have long been jealously protective of transparency in government and public access to records:
Public records are one portal through which the people observe their government, ensuring its accountability, integrity, and equity while minimizing sovereign mischief and malfeasance. See, e.g. , State ex rel. Gannett Satellite Information Network, Inc. v. Petro (1997), 80 Ohio St.3d 261, 264, 685 N.E.2d 1223 ; State ex rel. Strothers v. Wertheim (1997), 80 Ohio St.3d 155, 157, 684 N.E.2d 1239. Public records afford an array of other utilitarian purposes necessary to a sophisticated democracy: they illuminate and foster understanding of the rationale underlying state decisions, White [v. Clinton Cty. Bd. of Commrs. , 76 Ohio St.3d 416, 420, 667 N.E.2d 1223 (1996) ], promote cherished rights such as freedom of speech and press, *410 State ex rel. Dayton Newspapers, Inc. v. Phillips (1976), 46 Ohio St.2d 457, 467, 75 O.O.2d 511, 351 N.E.2d 127, and "foster openness and * * * encourage the free flow of information where it is not prohibited by law." State ex rel. The Miami Student v. Miami Univ. (1997), 79 Ohio St.3d 168, 172, 680 N.E.2d 956.
(Ellipsis sic.) Kish v. Akron , 109 Ohio St.3d 162, 2006-Ohio-1244, 846 N.E.2d 811, ¶ 16.
{¶ 54} Thus, we wholeheartedly agree with the first dissenting opinion as to the importance of the media in gathering and disseminating information to the public. But the exceptions to disclosure are as much a part of the Public Records Act as are the general provisions that require disclosure. Although it is difficult to craft a statute that advances conflicting interests, that is exactly what the General Assembly has done here: it has provided that autopsy reports are public records unless they satisfy one of certain narrow exceptions, including confidential law-enforcement investigatory records. While both dissenting opinions paste together a collage of arguments to make the case for narrowing the applicability of the CLEIR exception-to the point of nearly eliminating it-they do so without respect for the meaning and purpose of the CLEIR exception as expressed by *78 the legislature. We do a disservice to the General Assembly by abrogating its intent through judicial opinions that advance a preordained conclusion but are offered under the pretense of strict construction.
{¶ 55} In this case, PCCO has released a great deal of the information contained in the Rhoden and Gilley final autopsy reports and has properly withheld, pursuant to R.C. 313.10(A)(2)(e), facts that are essential for the continuing investigation. The media and the public will always desire to know immediately the goings-on of a criminal investigation before the investigation has traveled its due course, but unfortunately, and in rare cases, time is required so that the path leading to a suspect is followed with certainty before an accused is brought forward. The purposes of the Public Records Act can and should be served without jeopardizing the public's right to confidence in criminal investigations and our legal system. All criminal investigations must be carried out thoroughly, unfettered by collateral interests.
{¶ 56} Our conclusion recognizes that certain information contained in autopsy reports falls under one of the narrow exceptions to public disclosure for a temporary period. The exception is recognized for the information in autopsy reports that, for a time, constitutes CLEIR. Once the criminal investigation ends, CLEIR contained in autopsy reports may assume the status of public records and become available to the public. In order that justice might be delivered to all, patience may be required of some.
{¶ 57} For the foregoing reasons, we deny the requested writ of mandamus to compel disclosure of the information redacted from the autopsy reports at issue in this case.
D. Requests for attorney fees and statutory damages
{¶ 58} The Enquirer and the Dispatch seek statutory damages, arguing that PCCO failed to promptly release the redacted autopsy reports. Under former R.C. 149.43(C)(1) (in effect at the time the newspapers made the public-records requests at issue in this case), we may award statutory damages if a public record has not been provided promptly. 2015 Am.Sub.H.B. No. 64. But the statutory requirement is only that a copy of the document(s) must be made available within "a reasonable period of time." Former *411 R.C. 149.43(B)(1), 2015 Am.Sub.H.B. No. 64; State ex rel. Cincinnati Enquirer v. Deters , 148 Ohio St.3d 595, 2016-Ohio-8195, 71 N.E.3d 1076, ¶ 23. What is reasonable depends on all the pertinent facts and circumstances. State ex rel. Morgan v. Strickland , 121 Ohio St.3d 600, 2009-Ohio-1901, 906 N.E.2d 1105, ¶ 10.
{¶ 59} Two months passed between relators' requests for the final autopsy reports and PCCO's release of the redacted reports to the public. Although we have found a delay as short as six days to be unreasonable, it " ' "depends largely *79 on the facts in each case." ' " State ex rel. Consumer News Servs., Inc. v. Worthington City Bd. of Edn. , 97 Ohio St.3d 58, 2002-Ohio-5311, 776 N.E.2d 82, ¶ 37, 54, quoting State ex rel. Wadd v. Cleveland , 81 Ohio St.3d 50, 53, 689 N.E.2d 25 (1998), quoting Black's Law Dictionary 1214 (6th Ed.1990). Here, PCCO articulated a plausible explanation for the two-month delay-specifically, the magnitude of the investigation into the murders and the corresponding need to redact the reports with care. We find that two months was a reasonable amount of time in which to redact and release the reports. Therefore, statutory damages are unwarranted in this case.
{¶ 60} The Enquirer and the Dispatch also request that attorney fees be awarded in this case. But because we deny the writ, the newspapers are not entitled to attorney fees in connection with their seeking the release of the unredacted autopsy reports. Former R.C. 149.43(C)(2)(c), 2015 Am.Sub.H.B. No. 64. The Enquirer notes that R.C. 149.43(C)(3)(b)(iii) now provides for attorney fees in the event that a public office
acted in bad faith when the office * * * voluntarily made the public records available to the relator for the first time after the relator commenced the mandamus action, but before the court issued any order concluding whether or not the public office * * * was required to comply with division (B) of this section.
But that provision was added by 2016 Sub.S.B. No. 321, effective September 28, 2016. Because, as the Enquirer concedes, R.C. 149.43(C)(3)(b)(iii) was not yet in effect when PCCO produced the redacted records, the provision does not apply to this case. Therefore, the Enquirer and the Dispatch are not entitled to attorney fees.
III. CONCLUSION
{¶ 61} For the foregoing reasons, we deny the Enquirer's and the Dispatch's motions and the requested writ of mandamus.
Writ and motions denied.
Celebrezze, O'Neill, and Piper, JJ., concur.
Kennedy, J., dissents, with an opinion joined by O'Donnell, J.
Fischer, J., dissents, with an opinion joined by O'Donnell, J.
Frank D. Celebreeze Jr., J., of the Eighth District Court of Appeals, sitting for French, J.
Robin N. Piper III, J., of the Twelfth District Court of Appeals, sitting for DeWine, J.

In Maxwell at ¶ 55, we recognized that the plurality in Williams used this "narrowed definition of the primary-purpose test."

This ruling does not make Ohio an outlier. Numerous other states restrict the availability of autopsy reports while also recognizing that they may be admissible at a criminal trial as nontestimonial evidence. For instance, in California, autopsy reports may be exempt from disclosure under that state's public-records statute, Cal.Govt.Code 6254(f), as "investigatory * * * files compiled by any * * * local agency for * * * law enforcement * * * purposes." Dixon v. Superior Court , 170 Cal.App.4th 1271, 1273-1274, 88 Cal.Rptr.3d 847 (3d Dist.2009). But the fact that an autopsy report may be exempt from disclosure as a public record did not prevent the California Supreme Court from determining that an autopsy report was not testimonial evidence. See People v. Dungo , 55 Cal.4th 608, 621, 147 Cal.Rptr.3d 527, 286 P.3d 442 (2012). And in South Carolina, autopsy reports are exempt from disclosure as medical records under that state's public-records statute, Perry v. Bullock , 409 S.C. 137, 138-139, 761 S.E.2d 251 (2014), but autopsy reports may be admitted in a criminal proceeding without violating the confrontation rights of the defendant, State v. Cutro , 365 S.C. 366, 377-378, 618 S.E.2d 890 (2005).